# UNITED STATES DISTRICT COURT

# DISTRICT OF MASSACHUSETTS

* * * * * * * * * * * * * * * * * * * * * * * *

JACK ROGERS and PAUL PINALLA,
             Plaintiffs

             v.                          CIVIL ACTION NO.:
                                          04-10142-EFH

COMCAST CORPORATION and
AT&T BROADBAND,
             Defendants.

* * * * * * * * * * * * * * * * * * * * * * * *

## MEMORANDUM AND ORDER

October 21, 2004

HARRINGTON, S.D.J.

      The defendants, which are cable television providers, filed a motion to compel arbitration in an antitrust case involving two plaintiffs who are the defendants' customers. The motion is denied for the following reasons.

I.      BACKGROUND

      The Plaintiffs Paul Pinella and Jack Rogers became subscribers of cable television service in 1991 and 1994, respectively. At the time the plaintiffs became customers, their subscriber agreements did not contain an arbitration provision. In 2002, AT&T Broadband ("AT&T"), which was the plaintiffs' cable company at the time, sent its customers a new subscriber agreement. AT&T drafted the subscriber agreement and offered it to customers on a take-it-or-

leave-it basis. Section 10 of the subscriber agreement contained an arbitration provision that stated in relevant part:

> IF WE ARE UNABLE TO RESOLVE INFORMALLY ANY CLAIM OR DISPUTE RELATED TO OR ARISING OUT OF THIS AGREEMENT OR THE SERVICES PROVIDED, WE HAVE AGREED TO BINDING ARBITRATION EXCEPT AS PROVIDED BELOW.

This was the first time that an arbitration clause was included in the plaintiffs' subscriber agreements.[1] In November, 2002, AT&T was acquired by Comcast Corporation ("Comcast"). In 2003, Comcast sent its customers another subscriber agreement that was identical in all material respects to AT&T's 2002 subscriber agreement.

In December, 2003, the plaintiffs filed a complaint against AT&T and Comcast in Massachusetts state court. The complaint alleged that the defendants violated the Massachusetts Antitrust Act, Mass.Gen.L. ch. 93, § 4, § 5, by entering into "swapping agreements" with competitor cable companies. As part of these swapping agreements, AT&T traded some of its cable television customers in certain parts of the country in exchange for its competitors' customers in the Boston area. The complaint identified two such swapping agreements. The first was entered into between AT&T and Charter Communications in December, 1999. The second was entered into by AT&T and Cablevision Systems Corporation in April, 2000.[2]

---

[1] The defendants state in a footnote of their reply memorandum that an arbitration provision has been in effect since November, 2001, but they have failed to supply the Court with a copy of the 2001 provision or any other evidentiary support for this contention. Moreover, the motion to compel arbitration currently pending before this Court does not seek to enforce the alleged November, 2001 arbitration provision. In light of these facts, the Court considers the 2002 arbitration provision to be the first. The 2002 agreement is the operative document in this case.

[2] It should be noted that the Court reads the gravamen of the complaint to pertain to the swapping agreements only, and not the November, 2002 acquisition of AT&T by Comcast. Although the November, 2002 acquisition of AT&T by Comcast is mentioned in the complaint, the crux of the allegations involve the swapping agreements. This reading of the complaint is further supported by the fact that the relief sought by the plaintiffs in their complaint specifically included a request to enjoin the swapping agreements, but not the November, 2002 acquisition.

The defendants subsequently removed the case to this Court and filed the pending motion seeking to compel arbitration of the plaintiffs' claims pursuant to the arbitration provisions contained within the 2002 and 2003 subscriber agreements.

II.     DISCUSSION

The plaintiffs present several arguments as to why the defendants' motion should be denied. The plaintiffs initially assert that the arbitration provision contained within the subscriber agreements is invalid because it violates public policy and is unconscionable. The plaintiffs alternatively argue that even if the arbitration provision is valid, it is not applicable to the claims at issue in this particular case because the facts that gave rise to their complaint, namely, the swapping agreements, preceded the existence of the 2002 and 2003 subscriber agreements. The Court addresses the later argument first.

"In determining whether the claims at issue are subject to arbitration, this Court must first consider whether the parties agreed to submit their claims to arbitration." Fluehmann v. Assocs. Fin. Servs., 2002 WL 500564, 5 (D.Mass. 2002). Whether the parties agreed to submit their claims to arbitration is a question of contract interpretation, and "the final answer to such a question is ordinarily a function of the parties' intent as expressed in the language of the contract documents." McCarthy v. Azure, 22 F.3d 351, 355 (1st Cir. 1994). The documents at issue here are the 2002 AT&T and the 2003 Comcast subscriber agreements, both of which contain identical language.

The defendants argue that while the arbitration provisions do not explicitly apply retroactively, their scope is sufficiently "broadly worded" so that this Court should deem them to cover prior disputes. The defendants highlight the fact that the parties agreed to arbitrate "any

claim or dispute related to or arising out of this agreement or the services provided." According to the defendants, the key phrase is "the services provided." They argue that this phrase means all services provided under any contract at any point in time.

Broadly worded arbitration agreements are indeed afforded a "generous reading" in favor of arbitration. MCI Telecomm. Corp. v. Matrix Communications Corp., 135 F.3d 27, 32 (1st Cir. 1998). Courts often consider broadly worded agreements to include those that require arbitration of disputes relating to "all transactions between us," Beneficial Nat'l Bank, U.S.A. v. Payton, 214 F.Supp.2d 679, 689 (S.D. Miss. 2001), or disputes "arising out of your business," Belke v. Merrill Lynch, Pierce, Fenner & Smith, 693 F.2d 1023, 1028 (11th Cir. 1982), overruled on other grounds by Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213 (1985), or arbitration of "any controversy arising out of or relating to any of my accounts," Whisler v. H.J. Meyers & Co., Inc., 948 F.Supp. 798, 802 (N.D.Ill. 1996). Such language clearly indicates the parties' intent for the arbitration agreement to be interpreted broadly such that all disputes, including those that arose prior to the agreement's existence, are included within its confines. See Belke, 693 F.2d at 1028.

The defendants contend that the phrase "the services provided" displays the same broad intent as the phrases discussed above. The Court disagrees. The context of the phrase is important. See Blackie v. State of Maine, 75 F.3d 716, 722 (1st Cir. 1996) (stating that "[i]t is hornbook law," that contract interpretation should not "harp[] on isolated provisions, heedless of context."). The full text provides for arbitration of "any claim or dispute related to or arising out of this agreement or the services provided." The inclusion of the word "the" before "services provided" indicates to the Court that the services being discussed are those specifically provided under "this agreement." It is also noteworthy that "the services provided" is mentioned

immediately after "this agreement" without any qualifying language whatsoever that would indicate that the services do not refer to the agreement itself.  These two factors, acting in combination, lead the Court to believe that the phrase "<u>the</u> services provided" refers to specific services provided under the particular subscriber agreement at issue, and does not refer to services in a general sense.

If AT&T and Comcast wished for the arbitration provision to apply to services generally, rather than specifically, they could certainly have drafted a provision more akin to those in the cases discussed above.  <u>See</u> e.g., <u>Bischoff v. DirecTV, Inc.</u>, 180 F.Supp.2d 1097, 1106 (C.D.Cal. 2002) (agreement that required arbitration of "any legal claim relating to this Agreement . . . or your Service" applied retroactively).  They could also have drafted an arbitration provision that directly addressed retroactivity.  <u>See</u> e.g., <u>Boulet v. Bangor Sec., Inc.</u>, 2004 WL 1570120, n.4 (D.Me. 2004) (discussing retroactive effect of an arbitration provision that applied to transactions or agreements "whether entered into prior, on or subsequent to the date hereof.").  They did not.  The common law rule of contract interpretation which provides for adhesion contracts to be "construed strictly against the drafter" applies in the context of arbitration agreements. <u>Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc.</u>, 170 F.3d 1, 19 n.16 (1st Cir. 1999) (citation omitted); <u>see</u> <u>also</u> <u>Paul Revere Variable Annuity Ins. Co. v. Kirschhofer</u>, 226 F.3d 15, 25 (1st Cir. 2000) (adopting "the tenet of *contra proferentem* in construing ambiguities in arbitration agreements against the drafters.").  In light of the fact that the subscriber agreements at issue in this case are unquestionably adhesion contracts, this Court considers it appropriate to hold the defendants to the words they chose to use in drafting the arbitration provisions.

The defendants counter argue that the words they used to describe the scope of the arbitration provision are ambiguous and that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25 (1983).  However, "[t]he presumption in favor of arbitration is not a mindless mantra." Hendrick v. Brown & Root, Inc., 50 F.Supp.2d 527, 538 (E.D.Va. 1999) (citation omitted).  In previous cases, the First Circuit has acknowledged the federal policy favoring arbitration as "helpful in framing our discussion," but nevertheless went on to conduct a "substantially more rigorous analysis" of the agreement at issue. Raytheon Co., 882 F.2d at 9. Moreover, the First Circuit has repeatedly recognized "that the principle of resolving doubts in favor of arbitration is 'subject to constraints.'" Paul Revere, 226 F.3d at 25 (quoting Coady v. Ashcraft & Gerel, 223 F.3d 1, 9 (1st Cir. 2000)).  These constraints include basic rules of contract interpretation, the terms of the arbitration provisions, and the intent of the parties. See Restoration Pres. Masonry, Inc. v. Grove Europe Ltd., 325 F.3d 54, 60 (1st Cir. 2003) ("The policy in favor of arbitration does not supersede basic contract principles. . . ."); HIM Portland, LLC v. DeVito Builders, Inc., 317 F.3d 41, 43 (1st Cir. 2003) ("the FAA's proarbitration policy does not operate without regard to the wishes of the contracting parties.") (quoting Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 57 (1995)).  The federal policy in favor of arbitration does not mean that this Court should stretch to find ambiguity where there is none.  If one thing is clear, it is that federal law "does not require parties to arbitrate when they have not agreed to do so." E.E.O.C. v. Waffle House, Inc., 534 U.S. 279, 293 (2002).  In this case, the language of the arbitration provisions and basic rules of contract interpretation lead this Court to

conclude that the parties did not agree to arbitrate claims that arose prior to the issuance of the 2002 and 2003 subscriber agreements.

This conclusion is supported by the fact that the arbitration provisions contained a strict limitations period. Customers were required to contact the defendants "within one year of the date of the occurrence of the event or facts giving rise to a dispute . . . or you waive the right to pursue a claim based on such event, facts or dispute." A different section of the subscriber agreements shortened this time period to six months when a customer raised a billing dispute. If the defendants are correct in their contention that the arbitration provisions apply retroactively, then the limitations period contained within the provision would mean that disputes arising six months or one year prior to the first arbitration provision would effectively be waived. This type of waiver would be a significant departure from the parties' prior agreements, which did not even contain an arbitration provision. There is no indication that the phrase "the services provided" was intended to have such a dramatic effect on the parties' pre-existing contractual relationships. See Choice Sec. Sys., Inc. v. AT&T Corp., 1998 WL 153254 (1st Cir.1998) (per curiam) (arbitration clause in 1994 contracts did not apply to pre-1994 contracts in part because there was no indication "that the parties ever contemplated so radical a retroactive renegotiation of their earlier agreements.").

III.   CONCLUSION

The Court rules that the arbitration provisions contained within the 2002 and 2003 subscriber agreements do not apply retroactively. Given that the gravamen of the complaint pertains to the 1999 and 2000 swapping agreements, the Court rules that the plaintiffs' claims are not governed by the 2002 and 2003 arbitration provisions. In light of this ruling, the Court need

-7-

not, and does not, decide whether the arbitration provisions violate public policy or are unconscionable.  The defendants' motion to compel arbitration is denied.

    SO ORDERED.


                        /s/ Edward F. Harrington
                        EDWARD F. HARRINGTON
                        United States Senior District Judge